Filed 6/27/13  Jobe v. Kronsberg CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHIRLEY JOBE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DON KRONSBERG et al.,<br><br>    Defendants and Appellants. | G046853<br><br>(Super. Ct. No. 30-2011-00522139)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Francisco F. Firmat, Judge.  Affirmed.

Lazo Law Offices, Marc Y. Lazo and Christi Jo Elkin for Defendants and Appellants.

Callahan & Blaine, Edward Susolik and Raphael Cung for Plaintiff and Respondent.

\*            \*            \*

Don Kronsberg, Brenda Kronsberg, Vinnie Ruggieri, Mark G. Kogut, and Aline R. Kogut, individually and as trustees of a deed of trust (collectively hereafter defendants or the Kronsberg defendants), appeal from the trial court's preliminary injunction enjoining them from foreclosing on plaintiff Shirley Jobe's home.[1] Defendants contend the trial court erred in granting the injunction because Jobe's claims of fraud, financial elder abuse, unfair business practices, quiet title, and declaratory relief are barred by the applicable statutes of limitations. They also argue the trial court erred by failing to sustain their objections to Jobe's evidence. They further argue dismissal is required without reaching the merits because the trial court's order referred only to potential fraud by different defendants who obtained the first deed of trust on Jobe's property, while their loan had secondary priority, and therefore they argue the court erred in including them among the enjoined parties.

Finally, addressing the merits, they insist there was no likelihood Jobe could prevail on any of her claims and that the trial court erred in balancing the preliminary injunction's relative effects by failing to give greater weight to their potential financial harm compared to Jobe's potential loss of her home. They also argue the $1,000 injunction bond was too meager despite the trial court's finding ample equity in the home protected their interests. As we explain, the trial court did not abuse its discretion in granting the preliminary injunction or setting the bond amount, and we therefore affirm the trial court's rulings.

---

[1] Appellants' opening brief includes Margo Rosen among the Kronsberg defendants and appellants, but it does not appear she filed a notice of appeal.

2

# I

## FACTUAL AND PROCEDURAL BACKGROUND

At age 65, Jobe obtained a second mortgage in July 2007 on the Corona del Mar home in which she had lived since 1975, secured by a second deed of trust in defendants' favor. Defendants, a small, close-knit group of private investors, made the $1.6 million loan to Jobe at an annual interest rate of 14 percent, not including loan origination costs or fees. Over its five-year term, the loan required monthly payments of almost $19,000, plus a final balloon payment of more than 1.6 million dollars. The balloon payment of $1,618,667.76 exceeded the original loan amount of 1.6 million dollars.

According to Jobe, her only regular income consisted of her monthly Social Security check. She had received, at an unspecified date, the Corona del Mar home and two commercial properties in the City of Stanton in a divorce settlement with her ex-husband. She claimed "limited" knowledge of financial affairs, grasping "little about refinancing, the various types of mortgage loans, loan 'points,' discount points, how to determine the prevailing market rates for interest, deeds of trust, etc."

Jobe alleged defendants and her financial advisor, APEX Mortgage Services (Apex), which brokered the loan and is a codefendant in this action, "insufficiently disclosed to me certain important facts" about the second mortgage loan and other loans they made to her, secured by other properties. According to her declaration below: "I was not told, for instance, that the up-front loan fees of 8-9 percent that I was being charged were extremely high, particularly for loans in the amounts at which I was borrowing, and that most mortgage borrowers pay from 0 percent to 2 percent as up-front fees. I also was not told that the 14-16+ percent in annual interest

3

rates on these loans were similarly very high and significantly higher than what another person in the same situation would have paid. I have since learned that the interest rate on home equity loans and lines of credit during the same period were at the prime rate, or about 5-6 percent, so I was paying at least 3 times more."

Contrary to Apex's repeated assurances that "it was 'getting the best deals' for me," Jobe later calculated Apex's exorbitant fees cost her "at least $800,000." Jobe alleged: "This is in addition to the hundreds of thousands of dollars or potentially over 1 million dollars in excess interest rates, fees, and other expenses that I would not have been charged with if APEX and the lenders had not induced me to accept such loans, and had instead obtained and provided only the loans that were appropriate for my financial and personal situation."

According to Jobe, the second mortgage and defendants' eventual foreclosure proceedings in this matter had their origin in 2004 when Apex counseled her to tap the equity in her home and the Stanton parcels to invest the proceeds in real estate. Through various refinancings, the loan balance secured by the first deed of trust on her home in favor of JP Morgan Chase Bank, another defendant, grew from an $800,000 initial balance to $3.5 million by early 2007. Based on Apex's advice, Jobe used these funds to purchase a second residence in Las Vegas and two commercial properties, one in Costa Mesa and one in Yucaipa in San Bernardino County. Defendants financed Jobe's purchase of the Yucaipa property.

Despite the significant market value of her properties, Jobe found she "had little or no positive cash flow from them." According to Jobe, "Because of, among other things, decreased rents, high maintenance and upkeep costs, and my inability to manage the properties due to my age, I was losing money on them, or at best, breaking even every

4

month." Consequently, she "lived primarily on my Social Security payments, plus some loan proceeds."

She turned to Apex for further advice, and Apex urged her to commit more equity to its investment strategy. Thus, "during the period of 2004 to 2008, APEX advised me to obtain, and arranged for and brokered, about 30 loans to me secured by [her various] real properties," including her Corona del Mar home. Defendants worked with Apex as the loan broker in July 2007 to provide Jobe the $1.6 million second mortgage loan at issue in this case.

According to Jobe, she did not have to fill out an application for the loan, but later in discovery she learned someone prepared and submitted on her behalf an application suggesting she was qualified for the loan because she earned $65,000 in monthly income and held $450,000 in various bank accounts. These figures were wildly inaccurate. Don Kronsberg denied he or his fellow private investors who loaned Jobe the $1.6 million were the source of this false information, but he also claimed the false figures had no significance, even if he had seen the loan application. According to Kronsberg, Jobe's age, actual financial condition, and other details made no difference for the simple reason that her Corona del Mar home, a valuable oceanfront property, had substantial remaining equity. Accordingly, he and his investors determined she qualified for the loan on the basis of her collateral, regardless of her actual, minimal income and bank assets. Put another way, they concluded it did not matter whether Jobe could make her monthly loan payments because they could foreclose on her property and gain repayment that way. As Don Kronsberg phrased it in his deposition: "She had good equity in the property and a good location. And I did not think whether she could pay it back or not pay it back."

Jobe soon found herself in "a seemingly endless cycle of new loans, refinancings of previous loans, and the need to use the proceeds of one loan to make the payments on another to avoid default and foreclosure." By 2008, she knew "[t]his cycle could no longer be sustained": given her high loan balances "on each property, and due to the crash in the credit market . . . , I could no longer borrow any more money, or enough money, secured by one property to make interest payments owing on another property."

Jobe's priority was to stay in her residence until death by "obtain[ing] a reverse mortgage," but her efforts to do so failed. It appears Jobe held out hope she could remain in her home because the Corona del Mar property consisted of two parcels (lots 14 and 15) with different tax identification numbers that the county separately assessed each year, and she intended to and believed she had only mortgaged to defendants the back parcel (lot 14). According to Jobe, Apex knew and understood from the beginning that her goal was to live at home "for the rest of my life," and at each step along the way assured her that "it and the lenders with whom APEX worked would 'take care of all the paperwork,' and that all I had to do was sign documents presented to me." According to Jobe, "Often times these would be just the last page of a document, where I was asked to sign and did sign," as occurred when she granted defendants a second deed of trust on her Corona del Mar home. In any event, as Jobe's financial predicament grew more dire, she continued to attempt to make her loan payments on the first and second mortgages on her home. She sold one Stanton property to raise funds in an apparently futile attempt to become current with defendants, and she lost the other Stanton property to creditors in foreclosure.

She sued defendants and others in San Bernardino County in 2009 to attempt to save her Yucaipa commercial property from foreclosure, and she separately alleged in that action fraud, financial elder abuse, and similar claims concerning defendants' second mortgage loan secured by her Corona del Mar home. Defendants, however, succeeded in foreclosing on their loan against her Yucaipa lot. Defendants do not suggest the court in the San Bernardino action resolved Jobe's claims concerning their loan on her Corona del Mar home. According to Jobe, once she lost the Yucaipa property in foreclosure, she dismissed her action there voluntarily in November 2011 and refiled her remaining claims for convenience the next week in Orange County, closer to home.

Subsequently, in a first amended complaint, Jobe alleged against defendants, Apex, and other codefendants causes of action for fraud, financial elder abuse, quiet title, unfair business practices, and (against Apex only) breach of fiduciary duty and negligence, and she sought declaratory judgment, restitution, damages, and injunctive relief. Jobe specified defendants and Apex committed "fraud, predatory lending, and other wrongful conduct" in two different ways.

First, while Jobe had agreed to grant defendants a second priority deed of trust "with respect to Lot 14/Parcel 2" of her Corona del Mar property, "unbeknownst to [her], after asking her to sign only the last page of the second deed of trust, the Apex defendants and the Kronsberg defendants filled in and/or changed the reference on the first page thereof to reflect the encumbrance of both Parcels 14 and 15" by adding the tax assessor's parcel numbers for both lots, "i.e., the notation 'Apn: 052-062-14 & 15.'" (Note to reader: Complaint's use of all-caps deleted in this and subsequent quotations.)

7

According to Jobe, "as evidenced by the lack of [her] initials on any pages of the second deed of trust (and except for her signature on the last page), she did not see and did not know that [the] Apex defendants and the Kronsberg defendants had added in (after her signing) the references to Lot 14/Parcel 2 *and* Lot 15/Parcel 1" on the first page of the deed of trust. (Original italics and boldface.) She noted that "[c]onveniently for the Apex defendants and the Kronsberg defendants," one of Apex's principals served as the notary for Jobe's signature on the loan documents and the second deed of trust.

Jobe's second specific allegation of "fraud, predatory lending, and other wrongful conduct" consisted of her claim that Apex and defendants "knew that given her very limited income, there was no way that [she] could pay back the borrowed amount, especially given the high up-front fees charged and high interest rates. They made the loan knowing and specifically intending that [she] would default on it, thereby allowing them to seize the Property for significantly less than its fair market value."

Jobe made similar allegations that Washington Mutual Bank and its successor in interest, JP Morgan Chase Bank, improperly obtained the first priority deed of trust on the whole property instead of just the back parcel, and that the lender similarly engaged in predatory practices. Jobe sought a preliminary injunction to prevent the trustees of the first and second priority deeds of trust from foreclosing on her home before her claims could be tried. The trial court granted her motion, and only the Kronsberg defendants now appeal.

II

DISCUSSION

A.     *Defendants' Stipulation Does Not Require Dismissal*

Preliminarily, Jobe asserts defendants stipulated to the injunction, and therefore their appeal must be dismissed.  (See *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* (2010) 190 Cal.App.4th 1502, 1520 ["defendant waived objection to the preliminary injunction by expressly stipulating to it"]; *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 742 ["'While a bond is generally required for a preliminary injunction . . . , this requirement may be waived under circumstances where the parties stipulate to the injunction'"].)

Here, counsel for defendants wrote the words "IT IS SO STIPULATED" on the injunction order Jobe's counsel drafted, and counsel then signed his name under the stipulation before the trial court signed and entered the order.  Defendants assert counsel stipulated *only* "to the form of the [o]rder," and insist they did not intend to waive their right to appeal.  They rely on the longstanding rule that "after an issue has been regularly determined against a party" by the court, "mere consent to the entry of judgment as a formal matter of procedure . . . does not constitute such acquiescence as will deprive him of the right of appeal."  (*Grant Mem. Park v. Robla School Dist.* (1939) 33 Cal.App.2d 528, 532.)

Jobe asserts the written stipulation is dispositive and unambiguous, and she relies on the parol evidence rule to counter the notion defendants harbored a secret intent to consent only to the form of the order when they did not say so.  Although defendants strenuously resisted the injunction at the hearing, we observe that stipulating to a preliminary injunction still could be viewed as consistent with defendants' stated

concerns at the hearing about the drawn-out nature of their attempts to foreclose on Jobe's home. The trial court attempted to meet that concern, promising, "I will part the waves on my calendar to make sure that this case can be tried as soon as possible." The court observed, "I think what this case really deserves is a very, very early trial date, as early as counsel can be ready." The court suggested "you can have any Monday that you want starting" in six weeks. Thus, one could view defendants' stipulation as a decision to avoid further delays, including the delay inherent in appeal, only to have defendants subsequently reconsider and decide to appeal.

Viewed in context, however, defendants' stipulation is not the unambiguous consent to the preliminary injunction Jobe claims. Jobe's counsel drafted the order in advance of the injunction hearing based on the trial court's tentative ruling granting the preliminary injunction, but Jobe's counsel included a final, one-sentence paragraph that was neither in the court's tentative ruling, nor drawn from the court's oral remarks pronouncing its ruling. Defendant counsel's handwritten notation, "IT IS SO STIPULATED," immediately follows this stray paragraph, which someone, presumably counsel for defendants, *crossed out with large, handwritten "X" marks*. We therefore view defendants' "stipulation" as merely acknowledging and consenting to striking this language.[2] In other words, as defendants phrase it, counsel's stipulation and signature simply "ensur[ed] that the text of the [o]rder conformed to what the trial court actually ruled."

---

[2] The stricken paragraph stated: "This Order and Preliminary Injunction shall remain in effect until the Court renders final judgment in this action, and all appeals regarding the judgment have been resolved or the time for all appeals has expired." Striking this language demonstrated fidelity to the trial court's ruling, which did not include anything similar to this language.

10

Our conclusion no forfeiture occurred is bolstered by the Supreme Court's similar conclusion long ago in *Mecham v. McKay* (1869) 37 Cal. 154 (*Mecham*), holding that a stipulation to an order denying a new trial did not waive the defendants' right to appeal. The high court concluded: "The stipulation in this case on which the order denying a new trial was entered is not free from doubt, but, taking it all together, and construing it as a whole, in connection with the other facts disclosed by the record, we conclude that it was intended by the parties that the motion for a new trial should be denied *pro forma*, only to hasten the appeal; and that in consenting to the order the defendants did not intend to abandon their motion, or their objections to the rulings of the [c]ourt on the various points raised on the trial." (*Id.* at p. 159.)

Similarly, the stricken paragraph preceding counsel's signature suggests only a pro forma intent to ensure the accuracy of the order, rather than to forfeit both parties' right to appeal. (See Code Civ. Proc., § 904.1, subd. (a)(6) [an order granting or denying a preliminary injunction is appealable].) Like the Supreme Court in *Mecham*, we consider it "in no degree probable, after the fierce contest which occurred [below], and the elaborate statement prepared by the defendants in support of their [position], that they intended, by consenting to the order denying it, to abandon the chief grounds of their defense." (*Mecham*, *supra*, 37 Cal. at p. 159.) We therefore turn to the merits of defendants' appeal.

B. *The Absence of Express Findings Does Not Require Reversal*

Defendants first contend the injunction must be reversed because it is "based on evidence which has absolutely no bearing on any" of Jobe's claims against *them*. (Bold typeface removed.) They rely on the trial court's express citation in its injunction order to evidence of fraud committed by the lender secured by the first deed of

11

trust, J.P. Morgan Chase Bank. They infer that because the trial court's order expressly cited evidence supporting a likelihood of success on Jobe's fraud claims against *that* specific lender, *no* evidence supported the trial court's decision to also enjoin them — the Kronsberg defendants — from foreclosure. Specifically, the trial court's order noted: "There is substantial evidence that someone added a notation '15' that added the second parcel (Lot 15) after Plaintiff signed the Deed of Trust and received copies of the documents[.] A Deed of Trust that is based on a forgery is 'null and void and of no legal effect.' (See page 3[,] Exhibit C of Jobe declaration . . . )." As defendants correctly point out, Jobe's Exhibit C consisted of the trust deed Jobe executed in favor of the first lender and its successor in interest, JP Morgan Chase Bank, not the Kronsberg defendants. Defendants are mistaken, however, in their assertion that "the trial court committed prejudicial error when it used another party's deed of trust to determine that [Jobe] was likely to prevail on [her] claim" against the Kronsberg defendants.

Defendants' reasoning is flawed. That the trial court mentioned some evidence against another defendant does not mean no evidence supported the trial court's preliminary injunction ruling against defendants. Defendants cite no basis for their unstated premise that the trial court must detail the evidence supporting its ruling. (See 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 392, p. 460 ["A statement of decision is not required in ruling on a motion"].) To the contrary, the appellate posture and doctrine of implied findings require that we "must infer the trial court . . . made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 61 (*Fladeboe*).) This doctrine stems from three fundamental principles of appellate review: "(1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the

12

burden of providing an adequate record affirmatively proving error." (*Id.* at p. 58.) We therefore must presume the trial court impliedly made the requisite findings to support its ruling, and defendants' challenge on the basis of express findings concerning a different defendant therefore fails.

## C. *The Statutes of Limitations Do Not Require Reversal*

Defendants assert the trial court should not have reached the merits of Jobe's preliminary injunction motion because the applicable statutes of limitations barred her claims. Jobe alleged in her first amended complaint that defendants "engaged in fraud, predatory lending, and other wrongful conduct . . . in connection with" her loan and the second deed of trust she provided them in return for the loan, which issued in July 2007. She did not file this action until November 2011 and, because her claims have a maximum four-year limitations period, defendants argue they were all time-barred. (See Welf. & Inst. Code, § 15657.7 [four-year limitations period for financial elder abuse]; Bus. & Prof. Code, § 17208 [four years for unfair business practices]; Code Civ. Proc., § 338, subd. (d) [three years for fraud]; see also *Oates v. Nelson* (1969) 269 Cal.App.2d 18, 21 [quiet title limitations period tracks underlying fraud claim]; *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 734 [same for declaratory relief based on fraud].) Accordingly, defendants assert the trial court could not grant the preliminary injunction because it could not reasonably conclude Jobe had any likelihood of prevailing on any of her claims, given they had expired.

Defendants note Jobe did not raise in her complaint or at the preliminary injunction any claim that the limitations periods were tolled by her belated discovery of their alleged misdeeds. Instead, she relied on the doctrine of equitable tolling because she originally filed her lawsuit in San Bernardino Superior Court in January 2009 to stave

13

off foreclosure by defendants on the same loan and Corona del Mar property now at issue in this action *and* on another loan defendants made to her secured by commercial property she owned in San Bernardino County (the Yucaipa property).

Equitable tolling applies when "'an injured person has several legal remedies and, reasonably and in good faith, pursues one.'" (*Elkins v. Derby* (1974) 12 Cal.3d 410, 414.) In *Addison v. State of California* (1978) 21 Cal.3d 313, 319, our Supreme Court set out three requirements in deciding whether the doctrine of equitable tolling will suspend the running of the statute of limitations while an alternative remedy is pursued during the limitations period. The three requirements are: (1) timely notice to the defendant in filing the first claim, (2) lack of prejudice to defendant in gathering evidence to defend against the second claim, and (3) good faith and reasonable conduct by the plaintiff in filing the second claim. (*Ibid*.) Defendants dispute only the third requirement. They do not dispute Jobe could have filed her action concerning foreclosure on her Corona del Mar property in Orange County in 2009 instead of joining it for convenience to the San Bernardino action.

Defendants also acknowledge Jobe's San Bernardino action alleged the same or similar causes of action based on the same or similar misconduct claims Jobe alleges in this action. Indeed, they cite the similarity as evidence of litigation harassment and forum shopping precluding Jobe from invoking equitable tolling to pursue this action after the applicable limitations periods expired. They rely on *Mitchell v. Frank R. Howard Memorial Hospital* (1992) 6 Cal.App.4th 1396 (*Mitchell*), which summarized California's equitable tolling precedent as follows: "The underlying assumption of these cases is that when the plaintiff has several alternative remedies and makes a good faith, reasonable decision to pursue one remedy in order to eliminate the need to pursue the

14

other, the doctrine of equitable tolling will suspend the running of the statue of limitations if it becomes necessary to pursue the alternative remedy." (*Id.* at pp. 1407-1408.) Defendants highlight *Mitchell*'s cautionary language that "equitable tolling is not available to a plaintiff whose conduct evidences an intent to delay disposition of the case without good cause; ***and it is certainly not available to a plaintiff who engages in the procedural tactic of moving the case from one forum to another in the hopes of obtaining more favorable rulings***." (*Id.* at p. 1408, italics and bold typeface added by defendants.)

Defendants argue Jobe engaged in serial, vexatious litigation completely at odds with the equitable tolling doctrine. Specifically, defendants paint Jobe in a poor light for seeking refuge in federal bankruptcy proceedings after the San Bernardino trial court denied her preliminary injunction request in August 2009, and they insist it was only "[o]nce she realized that she would not prevail in the San Bernardino [a]ction [that she] voluntarily dismissed that action on November 3, 2011." They ascribe nefarious motives to her in filing this action "[s]even days later, on November 10, 2011, . . . alleging the same causes of action . . . ." They also note, from their perspective, an unfortunate turn of events when, after the Orange County trial court initially denied Jobe's request for a preliminary injunction, she retained new counsel and the court felt constrained to recuse itself based on a conflict of interest created by new counsel's substitution, and Jobe then obtained a preliminary injunction on her renewed motion.

Defendants, however, do not suggest principles of collateral estoppel or res judicata required the trial court to adhere to either the initial Orange County preliminary injunction ruling or the earlier denial in San Bernardino. In any event, the flaw in defendants' approach on appeal is that applying the equitable tolling doctrine is

15

necessarily a fact-bound determination, committed to the trial court's sound discretion. "[A trial] court's decision whether a statute of limitations has been equitably tolled is generally reviewed for an abuse of discretion, unless the facts are undisputed, in which event the legal question is reviewed de novo. [Citations.]" (*Santa Maria v. Pacific Bell* (9th Cir. 2000) 202 F.3d 1170, 1175 [applying California law], rejected on another ground in *Socop-Gonzalez v. I.N.S.* (9th Cir. 2001) 272 F.3d 1176, 1196.) Here, the facts are disputed. In particular, defendants contend Jobe engaged in forum shopping and only refiled her claim in Orange County as a form of litigation harassment delaying their inevitable right to foreclose on her property.

But in granting the preliminary injunction, the trial court implicitly rejected these contentions and found the requisite likelihood of success and balance of harms weighed in Jobe's favor, as we discuss below. Nor may we second-guess the trial court's implicit credibility findings. "'[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts.' [Citation.] Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order." (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625.)

A reasonable trier of fact could find Jobe dismissed her San Bernardino action in good faith and not to forum shop or unreasonably delay the proceedings. Given Jobe had lost her Yucaipa property, the trial court could credit her explanation that the matter belonged in Orange County, closer to all the parties and to her home, the subject matter of the litigation. Defendants' argument against equitable tolling therefore fails.

16

D.      *The Merits:  The Trial Court Did Not Abuse Its Discretion in Granting the Preliminary Injunction or Setting the Bond Amount*

Defendants claim the trial court abused its discretion both in granting the preliminary injunction preventing them from foreclosing on Jobe's home and in setting the injunction bond amount at $1,000.  We review an order granting or denying a preliminary injunction under the deferential abuse of discretion standard.  (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.)  "As its name suggests, a preliminary injunction is an order that is sought by a plaintiff prior to a full adjudication of the merits of its claim.  [Citation.]  To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits.  [Citation.]  [¶] . . .  [A]s a general matter, the question whether a preliminary injunction should be granted involves two interrelated factors:  (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief."  (*White v. Davis* (2003) 30 Cal.4th 528, 554, italics omitted.)

The burden is on the party challenging the injunction to establish that the trial court clearly abused its discretion.  (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.)  "Discretion is abused in the legal sense 'whenever it may be fairly said that in its exercise the court in a given case exceeded the bounds of reason or contravened the uncontradicted evidence.'  [Citations.]"  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 527 (*Continental*).)  We review factual findings underlying the trial court's ruling for substantial evidence, and independently review any questions of law.  (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739.)  "The classic rule that if any substantial evidence supports the finding of the trial court as to an issue of

17

fact a reviewing court may not substitute its own evaluation of the evidence, applies to an appeal from a preliminary injunction. . . . [I]t follows that if substantial evidence supports the order there is no abuse of discretion. [Citation.]" (*San Diego Gas & Elec. Co. v. San Diego Congress of Racial Equality* (1966) 241 Cal.App.2d 405, 407.)

"The likelihood of plaintiffs' ultimate success on the merits '*does* affect the showing necessary to a balancing-of-hardships analysis. That is, the more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue.'" (*Rite Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 336, 342, italics added, original italics deleted.) The converse is necessarily also true, "especially . . . when the requested injunction maintains, rather than alters, the status quo." (*Ibid.*) Thus, the interrelated ""mix"" of relative harm and likelihood of success ""guides the trial court in its exercise of discretion."" (*Ibid.*; accord, *King v. Meese* (1987) 43 Cal.3d 1217, 1227.) "'In the last analysis the trial court must determine which party is the more likely to be injured by the exercise of its discretion (citation) and it must then be exercised in favor of that party (citation).'" (*Continental*, *supra*, 68 Cal.2d at p. 528.)

"Given the drastic implications of a foreclosure, it is not surprising to find courts quite frequently granting preliminary injunctions to forestall this remedy while the court considers a case testing whether it is justified under the facts and law. [Citations.]" (*Baypoint Mortgage Corp. v. Crest Premium Real Estate etc. Trust* (1985) 168 Cal.App.3d 818, 825.) But the trial court should deny a preliminary injunction when there is *no* reasonable probability that the plaintiff will succeed on his or her claims. (*Pro-Family Advocates v. Gomez* (1996) 46 Cal.App.4th 1674, 1681; *Weingand v. Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820.)

If the trial court grants an injunction, it must require an undertaking by the applicant. (Code Civ. Proc., § 529, subd. (a).) Thus, a preliminary injunction ordinarily cannot take effect unless the applicant provides an undertaking to ensure it will pay any damages attributable to the temporary injunction if the court ultimately denies a permanent injunction. (*City of South San Francisco v. Cypress Lawn Cemetery Assn.* (1992) 11 Cal.App.4th 916, 920.) Without the undertaking bond, a preliminary injunction is a nullity. (*Oksner v. Superior Court* (1964) 229 Cal.App.2d 672, 687.) The amount of the bond is committed to the trial court's sound discretion. (*Hummell v. Republic Fed. Savings & Loan Assn.* (1982) 133 Cal.App.3d 49, 51.) "This court cannot substitute its own view as to the proper amount of bond," instead, "[i]t remains with the [trial] court's discretion, if defendants can show that the amount of damages may exceed the bond, to require an additional undertaking." (*Greenly v. Cooper* (1978) 77 Cal.App.3d 382, 390.) Consequently, a successful appellate challenge to the bond amount results in remand for a new bond hearing, rather than reversal of the preliminary injunction.

With these principles in mind, we turn to defendants' contentions.

1.    Likelihood of Success

Defendants argue Jobe failed to establish the requisite likelihood of success on any of her claims. "A single cause of action can sustain a preliminary injunction." (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 844.) Consequently, we must affirm the trial court's order if it reasonably could conclude one of Jobe's claims warranted preliminary injunctive relief. Her fraud claim alone suffices.

Forgery is a species of fraud, and tricking a homeowner into signing a trust deed with different terms than the homeowner intended constitutes a form of forgery. A

defendant commits forgery by "procur[ing] a genuine signature to a document by trick or fraud." (*People v. Looney* (2004) 125 Cal.App.4th 242, 248 [noting cases in which aluminum siding salesmen tricked homeowners into signing trust deeds].) "'Likewise, the rule is established in California that alteration of a document without authority with the intent to defraud may constitute forgery and that such alteration may consist of the insertion of matter in the document in question after it has been signed. [Citations.]'" (*Id.* at p. 247.) Thus, "[e]very person who, with the intent to defraud, alters, corrupts, or falsifies any record of any . . . conveyance, or other instrument . . . is guilty of forgery." (Pen. Code, § 470, subd. (c).) Here, Jobe sought a declaratory judgment and injunctive relief on grounds of fraud because defendants sought to foreclose on a forged deed of trust purporting to encumber both parcels of her Corona del Mar property, instead of just one.

Defendants argue Jobe's allegation that *someone* inserted the parcel numbers on the first page of the deed of trust after she signed the signature page is insufficient to establish fraud for two reasons. First, even assuming the truth of Jobe's allegation, they contend the county assessor's parcel numbers are irrelevant because "the legal description [of the property] in a deed of trust takes precedence and is dispositive of the precise real property to which the deed refers." They note Jobe "never disputed the legal description attached to the *recorded* Second Deed of Trust, which clearly references both parcels of land separately." (Italics added.)

But Jobe submitted to the court her copy of the deed of trust she signed, and it did *not* include a legal description of the property. In essence, defendants ask us to conclude the recorded version of the deed of trust is the one Jobe signed, including the attached property description. But "it is not the function of the reviewing court to

20

determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) Based on the copy of the deed Jobe claimed she signed and the court's assessment of her credibility, the court reasonably could conclude the deed did not include the property description when she signed it, and that the belated addition of a different parcel number than Jobe intended to encumber supported the conclusion a fraud occurred.

We find no merit in defendants' contention the trial court erred in overruling their evidentiary objections. As Jobe observes, the only objection defendants "specifically discuss is that involving the altered second deed of trust." Defendants argue "the trial court allowed [Jobe], without any foundational evidence, to attest to another version of the Second Deed of Trust which she claims to have signed without requiring her to provide an authenticated, *signed* copy of the deed of trust she purports to actually have signed." (Original emphasis.) Defendants insist, "If that signed copy of the deed of trust *actually* exists, it would have been easily obtainable and admissible as a publicly recorded document." (Original italics.)

The flaw in defendants' argument is that they simply assume the recorded document that Jobe signed included the parcel numbers on the first page and the attachment with the legal description of both parcels *when she signed it*, without recognizing this is precisely the factual question Jobe raises in her claim of fraud. Contrary to defendants' claim, Jobe adequately provided the foundation for the copy of the deed of trust she submitted with her declaration, stating, "I kept only the unsigned version of the second deed of trust that I was provided, a true and correct copy of which is attached as Exhibit E." There is no merit to defendants' evidentiary challenge.

As a second basis challenging the propriety of the preliminary injunction on grounds of fraud, defendants argued Jobe did not establish any likelihood of success in

showing *they* inserted the parcel numbers or otherwise committed fraud. Jobe alleged Apex and defendants engaged in a conspiracy to defraud her of both parcels by presenting documents without the parcel numbers (or a property description) for her to sign, with Apex's principal acting as the notary to conceal the sleight of hand. The record reflects Apex recorded the deed of trust on Kronsbergs' behalf. But whether these facts suffice to establish a conspiracy or that *defendants* defrauded Jobe is actually beside the point for determining the propriety of the preliminary injunction.

As the trial court observed, "A Deed of Trust that is based on a forgery is 'null and void and of no legal effect.'" Under California law, a "deed that has been materially altered after it was signed is a forgery." (*La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461, 477-478.) A forged deed does not divest "the rights of the original owner . . . even as to a [subsequent] bona fide purchaser." (*Wutzke v. Bill Reid Painting Service Inc.* (1984) 151 Cal.App.3d 36, 43 (*Wutzke*).)

The trial court therefore reasonably could enjoin defendants from foreclosing on Jobe's home pending adjudication of her fraud claims because even if *they* did not defraud her and only Apex tricked Jobe into encumbering more than she intended, the fraudulent trust deed encumbering two parcels instead of just one would be invalid. "It has been uniformly established that a forged document is void *ab initio* and constitutes a nullity; as such it cannot provide the basis for a superior title as against the original grantor." (*Wutzke, supra*, 151 Cal.App.3d at p. 43.) In other words, defendants could not validly offer for sale in foreclosure proceedings a trust deed that was null, void, and of no legal effect. Because the trial court reasonably could conclude Jobe established some likelihood of success in showing a fraud occurred, the trial court therefore also reasonably could grant her preliminary injunction request.

22

Defendants claim in a footnote in their reply brief that the trial court has now sustained their demurrer as to Jobe's fraud, quiet title, and declaratory relief claims in the third amended complaint she filed sometime after the preliminary injunction. As the trial court observed at the preliminary injunction hearing, however, defendants could move to dissolve the preliminary injunction if they subsequently filed a successful demurrer. We must conclude they have not done so or that the trial court denied their motion. In any event, we review the trial court's preliminary injunction ruling at the time it was made, and defendants fail to establish the trial court abused its discretion. As noted above, the trial court reasonably could conclude Jobe established a likelihood of success on her fraud claims against Apex, which would justify a preliminary injunction against defendants foreclosing on a deed of trust fraudulently encumbering two parcels instead of one.

2.     Balance of Harms and Bond Amount

Defendants contend that "[e]ven if" Jobe established a likelihood of success on any of her claims, the trial court abused its discretion in granting the preliminary injunction because it misjudged the balance of harms. Defendants assert "the irreparable loss of their investment" outweighed Jobe's potential loss of her home. Indeed, they argue it was mere speculation "the Property would be sold to a bona fide purchaser for value by the time a trial on the merits was completed," implying the injunction was unnecessary. In a related claim, they assert the trial court gravely undervalued their potential harm from the injunction by setting Jobe's bond obligation at a mere $1,000.

Defendants' claim that the injunction was unnecessary is specious. The record shows they scheduled a trustee's sale to foreclose on Jobe's home in March 2012,

23

which she only avoided by obtaining the preliminary injunction that month. Defendants' other claims are similarly without merit.

Defendants argue they suffer increasing and irreparably grave harm from the preliminary injunction because "with each passing day" pending the trial, Jobe "owes more and more on her loans secured by the Property." This argument betrays a misunderstanding of both the preliminary injunction and the appeal. Neither the preliminary injunction, nor defendants' appeal causes *any* harm to defendants by delay precisely because *neither* delays adjudication of their right to foreclose on Jobe's property. Simply stated, "[a]n appeal from an order denying a preliminary injunction does not deprive the trial court of jurisdiction to proceed to try the case on the merits." (*MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 623.) Defendants note in their briefing that the matter has still not gone to trial, but that delay is not attributable to the preliminary injunction or to the appeal. (*See ibid.*)

In essence, defendants confuse the concepts of increasing harm and irreparable harm. Specifically, the trial court determined that if a trial showed defendants were entitled to foreclose because Jobe failed to prove her claims, and the injunction therefore should be dissolved, ample home equity was available through foreclosure to make them whole on all they were owed. Defendants' right to outstanding interest is implicit in this ruling, and therefore the increasing accrual of interest over the life of the loan and duration of trial was not irreparable. Defendants cite no contrary evidence or calculations they provided the trial court, nor do they do so on appeal.

Instead, defendants attempt to reargue on appeal a battle of experts in which they contend the trial court misgauged the amount of equity because Jobe's expert incompetently overvalued the home at $13 million, while their expert more credibly

24

valued the home at a lower amount that they do not specify. We do not, however, resolve credibility contests on appeal. In any event, as noted, defendants do not argue or specify with calculations how their expert's lower equity figure would fail to make them whole on the amounts owed by Jobe. Consequently, they fail to meet their burden on appeal to show prejudicial error. (*Fladeboe*, *supra*, 150 Cal.App.4th at p. 58 [judgment is presumed correct; appellant must affirmatively demonstrate error].)

We note that the balance of harms and defendants' challenge to the bond amount are necessarily interrelated. A bond protects the party opposing a preliminary injunction against harm they may suffer from the trial court enjoining otherwise lawful conduct. In the foreclosure context here, the equity in Jobe's home essentially serves as an additional bond while the lawfulness of foreclosure on defendants' trust deed is adjudicated. Consequently, the trial court's conclusion the equity in the home protected defendants against any irreparable loss also invalidates their attack on the bond amount. If anything, the existence of ample equity in the home suggests the trial court reasonably could have imposed a lower bond amount, rather than the higher one defendants demand, because the equity alone adequately protected defendants.

Defendants rely on *ABBA Rubber Company v. Seaquist* (1991) 235 Cal.App.3d 1, 14-17, for the proposition that attorney fees and costs incurred in appealing a preliminary injunction or in proceeding to trial after the trial court has granted an injunction may factor into the sufficiency of the bond amount. (*Id.* at p. 17 ["When attorney fees . . . are added into the equation, the utter inadequacy of the undertaking is clear"].) But nothing in the Legislature's bond requirement for injunctions (Code Civ. Proc, § 529, subd. (a)) suggests it is a fee-shifting statute. To the contrary, parties are ordinarily required to bear their own fees. In any event, the unique

25

circumstances of this case require us to affirm the trial court's bond amount. Specifically, the true bond amount effectively included Jobe's equity in the home, and defendants have failed their burden on appeal to establish that figure was too low.

III

DISPOSITION

The trial court's preliminary injunction and bond rulings are affirmed. Respondent is entitled to her costs on appeal.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

26